UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

N° 07-CV-3567 (JFB) (AKT)
_____

CHERON DINKINS,

Plaintiff,

VERSUS

SUFFOLK TRANSPORTATION SERVICE, INC.,

Defendant.

_____

MEMORANDUM AND ORDER
July 15, 2010
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Cheron Dinkins ("plaintiff" or "Dinkins") brings this employment discrimination case against his former employer, Suffolk Transportation Service, Inc., ("defendant" or "STS"). Dinkins worked for STS as a school bus driver between 1994 and 2006. He claims that STS violated Title VII of the 1964 Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, because it discriminated against him on the basis of his gender when it fired him in March 2006. STS argues that it fired plaintiff because he violated Company rules by dropping off two students at a location that was not an authorized bus stop and because, before the unauthorized drop-off, plaintiff had amassed a long disciplinary record that included several bus accidents, multiple "final warning[s]," two involuntary reassignments, and numerous complaints from parents and school personnel.

A bench trial took place between June 7 and 9, 2010. As set forth below, the Court finds that plaintiff has not met his burden of showing by a preponderance of the evidence that his termination occurred because of his gender. Notably, although plaintiff attempts to identify female drivers who made unauthorized pickups or drop-offs but were not disciplined, the Court finds that these drivers engaged in conduct that was (1) permitted by STS, or (2) even if not permitted, unknown to STS. Moreover, plaintiff has not identified any female driver who had a disciplinary record comparable to

his but was allowed to stay on the job. Nor is there any other evidence from which the Court concludes that STS fired plaintiff because of his gender. Instead, the Court found to be fully credible the testimony of the decisionmaker for STS, Philip DiDomenico, that plaintiff was fired because of his repeated violations of Company policy over the years (culminating in the unauthorized drop-off of a student), and not because of his gender. As such, plaintiff has not met his burden of proving intentional discrimination.

I. BACKGROUND

Plaintiff, initially proceeding *pro se*, filed the complaint in this case on August 22, 2007, alleging gender discrimination in violation of Title VII of the 1964 Civil Rights Act. Defendant answered on November 13, 2007, and, shortly thereafter, plaintiff's attorney entered an appearance. The parties undertook discovery through much of 2008. On December 5, 2008, defendant moved for summary judgment. The Court heard oral argument on the motion on February 6, 2009 and, three days later, denied the motion in a Memorandum and Order. *See Dinkins v. Suffolk Transp. Servs.*, No. 07-CV-3567 (JFB) (AKT), 2009 WL 303452 (E.D.N.Y. Feb. 9, 2009).

The parties undertook limited additional discovery following the summary judgment ruling. The Court held a bench trial between June 7 and 9, 2010.[1] Cassandra Hopkins and William Hicks testified for the plaintiff during his case-in-chief. The plaintiff also testified on his own behalf during both his case-in-chief and during his rebuttal case. Myrna Santiago, Barbara Tully, Leonilia Alarcon, and Philip DiDomenico testified for the defense. Both sides also made post-trial submissions. The Court has fully considered all of the evidence presented by the parties, as well as their written submissions. Below are the Court's Findings of Fact and Conclusions of Law.

II. FINDINGS OF FACT

The following section constitutes the Court's Findings of Fact[2] pursuant to Federal Rule of Civil Procedure 52(a)(1). These Findings of Fact are drawn from witness testimony at trial and the parties' trial exhibits, including the undisputed facts submitted by the parties in the Joint Pre-Trial Order ("PTO").

A. Plaintiff's Employment History with STS and Disciplinary Record

Plaintiff worked for defendant as a school bus driver between October 1994 and March 20, 2006. (PTO, Stip. Facts ¶ 2.) Defendant is a bus company that, among other things, contracts with multiple school districts to provide bus services. (Tr. 306:25-307:15.) Philip DiDomenico, STS's Executive Vice President, made the decision to hire plaintiff and also made the decision to terminate him. (Tr. 314:4-5.)

1. Incidents Between 1995 and 1998

When plaintiff began working for defendant, he was assigned to drive a route in the Brentwood School District. During this time, defendant received a number of complaints regarding plaintiff's driving and

---

[1] Both sides consented to a bench trial. (*See* Docket Entry 36, Amended Joint Pre-Trial Order, at 5.)

[2] To the extent that any Finding of Fact reflects a legal conclusion, it shall to that extent be deemed a Conclusion of Law, and vice-versa.

repeatedly disciplined plaintiff for violations of Company rules. In March 1995, for example, the Brentwood School District forwarded to defendant a letter from a concerned parent. The letter asserted, among other things, that plaintiff "speeds through the parking lot often causing parents with young children . . . to jump onto grass dividers"; was "abusive" towards the parent when the parent confronted him; and "became repeatedly more aggressive" towards the parent. (Def.'s Ex. E.) STS maintained a record, called a "Summary of Problems," of disciplinary hearings involving Dinkins. (Tr. 319:2-16.) The Summary of Problems reflects that plaintiff was late in leaving for his route several times in 1995. (*See* Def.'s Ex. R.) On March 31, 1995, plaintiff met with company officials, including DiDomenico, and was told that further complaints "could be cause for dismissal." (*Id.*)

A year and a half later, in September 1996, plaintiff was involved in an at-fault accident while transporting school children on his bus. The accident report noted that plaintiff had stopped at a stop sign but then proceeded northbound into an intersection where a car coming eastbound crashed into the bus. The report noted that plaintiff "had [the] only traffic control device—100% at fault, other reports of him speeding." (Def.'s Ex. H.) Additionally, following the accident, an official with the Brentwood School District wrote a letter to defendant expressing "some concerns regarding this driver." The school district official stated that she had received a report that plaintiff drove at excessive speeds and was late. Moreover, the school official noted that "I also had this driver in to see me at least three times last school year regarding his driving habits, lack of concern for students and parents, and general attitude." (*See* Def.'s Ex. G.) The school official requested that plaintiff be reassigned to a bus route that did not include a kindergarten school and warned that any further complaints regarding plaintiff "will lead to his disqualification of driving Brentwood students in or out of the district." (*Id.*) Defendant held a hearing for plaintiff following this incident at which plaintiff was suspended for two days and required to attend additional training. Additionally, plaintiff was taken off his route in the Brentwood School District and reassigned to a route in the Bay Shore School District. (Def.'s Ex. R; Tr. 325:1-326:12.)

In Bay Shore, plaintiff continued to have problems. In January 1997, the school district notified defendant that plaintiff had repeatedly called students names—including "Blondie," "little rich white boy," and "gay"—and that he had driven recklessly and failed to make scheduled pickups. The school district requested that plaintiff be relieved of his duties as a driver for the district. (Def.'s Ex. I.) Defendant held another hearing regarding plaintiff. At this hearing, plaintiff was assigned to an open route back in the Brentwood School District. (Def.'s Ex. R.)

In September 1997, plaintiff was involved in a second at-fault accident when he bumped his bus into another bus in the bus yard. (Def.'s Ex. J.) In August 1998, after defendant had given plaintiff additional, seasonal employment as a transit bus driver, plaintiff punched a bus windshield, damaging it, after he narrowly avoided another

accident.[3] He was given a "final warning" by defendant. (Def.'s Ex. K; Tr. 161:7-20.)

2. Incidents Between 2002 and 2004 and the 2005 Certificate of Achievement

There was no evidence that plaintiff was involved in any incidents over the next several years. In 2002, however, defendant received multiple complaints about plaintiff, and plaintiff was involved in another accident. Specifically, in May 2002, defendant received a letter from a parent that plaintiff was observed "beeping his horn . . . , trying to push [the parent] off the road," tailgating the parent, driving erratically, and narrowly avoiding an accident. (Def.'s Ex. M.) The next month, a Brentwood School District official wrote defendant and noted that she had met with plaintiff "more than once this school year," but "he [had] not taken my warning seriously." The letter requested that plaintiff not be allowed to drive for a particular elementary school during the next school year. (Def.'s Ex. N.) The Summary of Problems reflects that, in October 2002, defendant held a hearing with plaintiff because it had "been receiving several complaints on his driving and his speeds." Plaintiff was warned that further complaints "could lead to a suspension." (Def.'s Ex. R.) Also around this time, plaintiff was involved in another accident when he crashed into another vehicle while pulling his school bus away from a curb. (Def.'s Ex. L.) Plaintiff was required to attend additional training following this accident. (Def.'s Ex. R.)

---

[3] During trial, plaintiff admitted he punched the windshield. According to plaintiff, he had been told that he would not be allowed to drive the transit bus if he had an accident, so, after narrowly avoiding an accident, he "lash[ed] out" at the windshield. (Tr. 180:23-181:5; 202:2-203:6.)

In 2004, plaintiff was still driving a route in the Brentwood School District, and defendant was again receiving complaints about him. Specifically, STS was advised that plaintiff was late both picking up and dropping off students for a school trip. (Def.'s Ex. P.) As a result of this complaint, defendant suspended plaintiff for one day. (*Id.*; Tr. 349:3-10.) In June 2004, another hearing was held because of plaintiff's "constant lateness." Plaintiff was told that any further lateness "may have the result of termination." (Def.'s Ex. R.) A few months later, in September 2004, defendant held another hearing with plaintiff regarding plaintiff's failure to obey a dispatcher. The Summary of Problems reflects that plaintiff was told that further incidents "may result in termination or suspension. This is a final warning." (*Id.*) Later that same month, a Brentwood school district official wrote defendant stating that "[o]nce again complaints of a nasty, uncooperative driver [have] come to my attention and once again upon inquiring who the driver is, it turns out to be Charon [sic] Dinkins." (Def.'s Ex. Q (emphasis in original).) The letter went on to say that plaintiff "had been spoken to many times last year about his manners, his lateness, & Lais-sez Faire [sic] attitude. He was also spoken to by me last year and warned if his behavior continues, he will be prohibited to drive for Brentwood . . . ." (*Id.*) Defendant held another hearing with plaintiff on October 1, 2004 at which plaintiff was again given a "final warning" and told that the next infraction would result in termination. (Def.'s Ex. R.)

On June 1, 2005, defendant gave plaintiff a certificate "In Recognition of Distinguished

4

Achievement in Ten (10) Years of Outstanding Service." (Pl.'s Ex. 2.)

B. The March 16, 2006 Incident and Plaintiff's Termination

On the afternoon of March 16, 2006, plaintiff was driving a school bus in the Brentwood School District. One of the students riding the bus, Cassandra Hopkins, asked to be dropped at an intersection that was not an authorized bus stop. (Tr. 142:13-24.) Ms. Hopkins told Dinkins that she had an emergency doctor's appointment and would be late if she had to get off the bus at her normal stop. (Tr. 18:21-20:3.) Defendant's written regulations state that "[i]f you ever take children any place other than the school they attend or their designated stop, you are in serious violation of company policy, regardless of your intentions." (Pl.'s Ex. 5 at 34.) Plaintiff knew about this rule. (Tr. 113:16-17.) Additionally, plaintiff had been previously warned about unauthorized drop-offs and pickups. (Tr. 156:3-157:2; Def.'s Ex. R.) Nonetheless, plaintiff discharged Hopkins and her friend, Melissa Ridge, at the intersection. (Tr. 18:8-14; 20:11-12; 142:17-143:1.)

An STS "road supervisor," Barbara Tully, observed the drop-off while sitting in her car in a nearby parking lot. (Tr. 284:11-285:10.) As a "road supervisor," Tully spent the initial part of her work day in the STS school-bus yard. As will be discussed below, she worked primarily in a shed where she and another bus supervisor would "check in" drivers arriving for work and brief them regarding issues such as modifications to their route for a particular day. (Tr. 278:8-16.) Once the buses were on the road, Tully and the other road supervisor would drive around in their own cars to observe the drivers in action. (Tr. 277:18-278:2.)

On March 20, 2006, defendant held a hearing regarding plaintiff's drop-off of Hopkins and Ridge. At the hearing, plaintiff was told that his employment was being terminated. DiDomenico told plaintiff that if he signed a voluntary resignation form, DiDomenico would "put in a word" for plaintiff at another bus company. (Tr. 53:1-54:2.) Plaintiff signed the voluntary resignation. (Tr. 150:18-24; Def.'s Ex. S.) DiDomenico called another bus company as he had offered to do,[4] and plaintiff began working at that other bus company approximately three weeks after the end of his employment with defendant. (*See* Tr. 87:13-14.)[5]

During this litigation, plaintiff has contended that he acted appropriately by dropping off Hopkins and Ridge at the unauthorized stop because it was an emergency situation. (*See, e.g.*, Pl.'s Proposed Findings of Fact and Conclusions of Law with Calculations of Plaintiff's Claim ¶¶ 15-16.) STS policy tells drivers that, in an emergency, they are to "[u]se [their] judgment on [their] first course of action [and n]otify the Dispatcher *immediately* either by radio or phone." (*See* Pl.'s Ex. 5, at 37 (emphasis added).) Plaintiff argues that he followed these procedures here because he believed Hopkins was having a medical emergency, he "used [his] judgment"[6] to drop her and Ridge off, and—although he never

---

[4] (Tr. 356:3-17.)

[5] Although plaintiff signed a "voluntary resignation" form, the Court finds—and neither party disputes—that STS actually fired plaintiff. (*See, e.g.*, Tr. 152:11-18; 208:22-210:25; 314:4-5.)

[6] (Tr. 68:12-20.)

5

notified the dispatcher—"about five minutes"[7] after he dropped off Hopkins and Ridge, he received a phone call from Tully, the STS road supervisor, who had observed his stop. Plaintiff claims that because of this phone call, he believed he did not need to notify the dispatcher.

The Court rejects plaintiff's assertion that he followed the appropriate procedures for an emergency situation. As a threshold matter, the Court does not view the situation as an emergency. In any event, the Court rejects plaintiff's argument that Tully's call to plaintiff "five minutes" after the fact somehow absolved plaintiff of his duty to contact the dispatcher "immediately."[8] Notably, plaintiff had no idea that Tully would call him five minutes after the event, and plaintiff provided no credible explanation as to why he did not call the dispatcher either before dropping Hopkins and Ridge off or immediately after. Additionally, Tully was a road supervisor driving in her car, not a dispatcher.[9] Thus, the Court rejects plaintiff's attempt to justify the stop as an emergency and finds instead that the stop violated STS policy.

### C. Evidence Regarding Female Drivers and Unauthorized Stops

At trial, plaintiff attempted to introduce evidence that female drivers had, like plaintiff, made unauthorized stops but, in contrast to plaintiff, were not disciplined. As described in more detail below, plaintiff focused his efforts on attempting to show that (1) an after-school activities bus driven by a female made unauthorized drop-offs; (2) two female drivers, Carla Chica and Isaura Flores, brought their children into the bus yard and transported them to school on their buses; and (3) Chica also used her school bus to transport her son from her home to school.

#### 1. Unauthorized Stops of the After-School Activities Bus

First, plaintiff asserts that an after-school activities bus driven by a female driver made unauthorized stops. Unlike the normal school buses, the after-school activities bus did not have designated stops. Instead it followed a designated route along which it stopped as needed. Cassandra Hopkins, the same student who plaintiff dropped off at an unauthorized stop, testified that a female bus driver on the after-school activities bus would drop her off "two to three times a month" "wherever [she] asked to be dropped off," even at points that were not along the designated route. (Tr. 23:6-24:5.) Hopkins also testified that the female driver was never disciplined for this. (Tr. 24:19-22.) There was no testimony, however, that STS knew about the unauthorized stops.

#### 2. Children in the Bus Yard

Second, plaintiff asserted that two female drivers, Carla Chica and Isaura Flores,

---

[7] (Tr. 51:8-10.)

[8] Tully testified that she did not call plaintiff on his cell phone following the drop-off. She did state that she may have called plaintiff "later in the day" after she spoke to her supervisors about the incident. (Tr. 296:16-297:2). For the sake of argument, the Court will credit plaintiff's testimony that Tully in fact called him "about five minutes" after the stop.

[9] As a matter of logic and common sense, the dispatcher could presumably do things in an emergency situation—i.e., contact school officials and emergency services—that a road supervisor driving around in her car might be less able to do.

6

brought their children into the STS bus yard in the morning and then transported them on their buses. Plaintiff's testimony was the only evidence that this occurred. (*See* Tr. 57:2-15.) Plaintiff also testified that "occasionally," when Flores and Chica would return their buses to the bus yard at the end of the day, their children would be with them. (*See* Tr. 59:3-19.) Plaintiff testified that it would have been "obvious" to STS supervisors that Chica and Flores were using the bus to transport their children. (Tr. 57:14.)

STS argued that it was unaware that Chica and Flores were bringing their children into the bus yard. (Tr. 462:19-463:9.) The two supervisors who worked in the yard each morning, Barbara Tully and Leonilia Alarcon, both testified that they never saw Chica or Flores bring their children onto their buses. (Tr. 266:17-19; 273:8-274:7; 303:10-17.) According to Tully and Alarcon, during the time when bus drivers were arriving at work, they were sitting at a desk in a trailer "checking in" the approximately 100-120 drivers who drove buses out of the yard. (Tr. 261:17-265:3; 280:15-281:16.) The process of checking in the drivers occupied most of Tully's and Alarcon's attention during this time, and although Alarcon would occasionally step out the back of the trailer to smoke a cigarette, they were not actively observing the yard. (Tr. 265:4-11; 282:6-10.) Furthermore, DiDomenico, STS's Executive Vice President, testified that it is dark for much of the school year during the times when bus drivers are arriving for work and in the evenings. (*See* Tr. 395:8-21.) DiDomenico also testified that the bus yard is six acres and "a little bit L shaped." (Tr. 395:4-7.)[10]

Based on this testimony—and particularly because Tully and Alarcon worked inside a trailer during the mornings and because of the size and shape of the bus yard—the Court finds that even if Chica and Flores brought their children into the bus yard, STS was unaware of this.

### 3. Home Pickups and Drop-offs

Plaintiff also asserted that Chica violated Company policy by using her bus to pick up her son at home and drop him off at school.[11] Plaintiff introduced videotape and surveillance evidence showing that Chica used her school bus on five occasions in May 2009 to pick up her son at her home. (*See* Pl.'s Exs. 16-A; 16-B.) All five pickups occurred between 7:15 and 7:21 a.m. (*See* Tr. 223:14-18; 225:8-20; 226:18-24; 226:25-227:5; Pl.'s Ex. 16-A.) Following three of the pickups, the bus was observed traveling to Brentwood High School—approximately one-quarter to one-half mile away—where

---

[10] DiDomenico also testified that while standing behind the trailer it was possible, but difficult, to observe people entering the bus yard and that it was also possible to observe people coming into the bus yard from the window of the trailer. (Tr. 393:22-395:7.) In his post-trial submission, plaintiff asserts that this testimony is irreconcilable with Alarcon's and Tully's. The Court disagrees and finds any inconsistencies to be minor and immaterial. The gist of Tully's and Alacron's testimony regarding their observation of the bus yard was that, during the mornings, they were focused on tasks inside the trailer and were not actively observing the yard. The Court finds that this is not irreconcilable with DiDomenico's testimony regarding what a person could potentially observe from in and around the trailer.

[11] Plaintiff additionally claimed that Flores did the same thing. However, he introduced no credible evidence to support this assertion.

7

the child was dropped off. (Tr. 224:8-20; 226:3-4; Pl.'s Ex. 16-A.)[12]

Defendant argued that the pickups and drop-offs were permitted by STS policy and introduced evidence to support this argument. Specifically, DiDomenico, the Executive Vice President of STS, testified that during down time between routes, STS school bus drivers are allowed to use their bus for personal errands. (Tr. 378:20-379:3.) These personal errands can include using the bus to transport members of the driver's family. (Tr. 379:4-7.) Based on DiDomenico's testimony at trial and on a review of Chica's run sheet,[13] the Court concludes that the pickups and drop-offs occurred during Chica's off-time and, accordingly, were permitted by STS policy.

### D. Evidence Regarding the Termination of Female Bus Drivers

During the time plaintiff worked for defendant, defendant terminated nine female drivers. (*See* Def.'s Exs. U-W; Y-1, Y-2, Z-CC.) The separation records for these employees reflect a variety of reasons for termination including failing an alcohol test;[14] being involved in an accident;[15] being rude to school staff and entering the school facility without permission;[16] being disqualified from three school districts;[17] and repeated disciplinary issues.[18]

### III. BURDEN OF PROOF

Plaintiff bears the burden of proof in this case. He must prove by a preponderance of the evidence that defendant discriminated against him on the basis of gender. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507-08 (1993); *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004); *Vails v. Police Dep't of City of N.Y.*, 54 F. Supp. 2d 367, 378 (S.D.N.Y. 1999).

### IV. DISCUSSION AND CONCLUSIONS OF LAW

#### A. Applicable Law

For the reasons that follow, the Court concludes that plaintiff has failed to meet his burden on his Title VII claim against defendant.

Title VII of the 1964 Civil Rights Act provides, in relevant part:

> It shall be an unlawful employment practice for an employer–
>
> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . . .

---

[12] There was no evidence or testimony regarding where the bus went after the other two pickups.

[13] (Tr. 378:1-379:25; Def.'s Ex. II.)

[14] (Def.'s Exs. V, W.)

[15] (Def.'s Ex. Y-1; Tr. 368:12-24.)

[16] (Def.'s Ex. Z; Tr. 371:9-13.)

[17] (Def.'s Ex. AA.)

[18] (Def.'s Ex. U.)

8

42 U.S.C. § 2000e-2(a). When, as here, the plaintiff presents no direct evidence of discriminatory treatment based on his gender, courts use the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether plaintiff has shown unlawful discrimination. Under the *McDonnell-Douglas* framework, a plaintiff must first establish a prima facie case of discrimination by showing "'(1) that he belonged to a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Sassaman v. Gamanche*, 566 F.3d 307, 312 (2d Cir. 2009) (quoting *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008)). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001).

Once plaintiff establishes a prima facie case, the burden shifts to the defendant to "'articulate some legitimate, nondiscriminatory reason for the' termination." *Patterson*, 375 F.3d at 221 (quoting *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996)). If the defendant carries that burden, "the burden shifts back to the plaintiff to demonstrate by competent evidence that 'the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Patterson*, 375 F.3d at 221 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). To meet this burden, the plaintiff may rely on evidence presented to establish his prima facie case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace v. Costa*, 539 U.S. 90, 99-100 (2003).

The *McDonnell-Douglas* test is not, however, "'intended to be rigid, mechanized, or ritualistic.'" *St. Mary's Honor Ctr.*, 509 U.S. at 502 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)). The ultimate question is whether plaintiff has proven by a preponderance of the evidence that the defendant has intentionally discriminated against him. *See Patterson*, 375 F.3d at 221; *Vails*, 54 F. Supp. 2d at 376.

Here, this Court has already held, in its opinion denying defendant summary judgment, that plaintiff had established a prima facie case. Additionally, defendant has proffered a non-discriminatory reason for plaintiff's discharge—specifically plaintiff's unauthorized drop-off of passengers on March 16, 2006 and his previous disciplinary history. Thus defendant has articulated a legitimate reason for termination. *Cf. Pacenza v. IBM Corp.*, No. 04 Civ. 5831 (PGG), 2009 WL 890060, at *12 (S.D.N.Y. Apr. 2, 2009) (finding that discharge of plaintiff for violating company "internet usage and harassment policies" was a legitimate, non-discriminatory reason for termination), *aff'd*, 363 F. App'x 128 (2d Cir. 2010); *Brown v. The Pension Boards*, 488 F. Supp. 2d 395, 406 (S.D.N.Y. 2007) ("'Certainly, an employer is entitled to discharge an employee who fails to follow company rules . . . .'" (quoting *Jackson v. Nor Loch Health Care Facility*, 297 F. Supp. 2d 633, 636 (W.D.N.Y. 2004), *aff'd*, 134 F. App'x 477 (2d Cir. 2005))); *Costello v. St. Francis Hosp.*, 258 F. Supp. 2d 144, 155-57 (E.D.N.Y. 2003) (stating that violations of,

9

*inter alia*, hospital's sexual harassment policy and no solicitation policy were legitimate reasons for termination); *E.E.O.C. v. Nat'l Cleaning Contractors, Inc.*, No. 90 Civ. 6398(BSJ), 1997 WL 811494, at *1 (S.D.N.Y. Sept. 2, 1997) (stating, in an opinion following a Title VII bench trial, that defendant "had legitimate, non-discriminatory reasons for terminating [plaintiff]: [plaintiff's] . . . lengthy record of continuing disciplinary problems and finally her altercation with a security guard").

As such, both sides have met their burdens of production, and the purpose of the bench trial was to resolve disputed issues of fact (including credibility determinations) and determine the "ultimate question" of whether plaintiff has shown discrimination by a preponderance of the evidence. *See Aikens*, 460 U.S. at 714-15 ("But when the defendant fails to persuade the district court to dismiss the action for lack of a *prima facie* case, and responds to the plaintiff's proof by offering evidence of the reason for the [adverse employment action], the fact finder must then decide whether the [adverse employment action] was discriminatory within the meaning of Title VII." (footnote omitted)); *Vails*, 54 F. Supp. 2d at 376.[19]

B. Application

Plaintiff has not shown by a preponderance of the evidence that defendant intentionally discriminated against him.

Plaintiff's theory of the case was that female drivers routinely violated rules regarding unauthorized pickups and drop-offs but—unlike plaintiff—were not terminated. As discussed in the Court's Findings of Fact, plaintiff asserted (1) that an after-school activities bus made unauthorized stops but that the driver was not disciplined; (2) that two female drivers, Karla Chica and Isaura Flores, brought their children into STS's bus yard and transported them on buses; and (3) that Chica was observed—in 2009, three years after plaintiff's termination—using her school bus to pickup her child from her home and then transport him to school.

Although it is well settled that a plaintiff can raise an inference of discrimination by showing disparate treatment,[20] Dinkins failed to provide credible evidence at trial of disparate treatment. For disparate treatment to be probative of discrimination, a plaintiff must show that the employees who were treated differently from him were "similarly situated." *See Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). "An employee is similarly situated to co-

---

[19] *Accord Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377 (4th Cir. 1995) ("[G]iven that this appeal comes to us following a bench trial on the merits, we no longer concern ourselves with the vagaries of the *prima facie* case because subsequent to a trial in a Title VII action, the ultimate issue is one of discrimination *vel non.*"); *Am. Fed. of State, County & Mun. Employees, AFL-CIO (AFSCME) v. County of Nassau*, 799 F. Supp. 1370, 1411 (E.D.N.Y. 1992) ("Thus, once the defendant has presented evidence, the question of whether the plaintiff has established a prima facie case of discrimination is irrelevant: At that point, the court has all the evidence probative of the ultimate factual issue in a Title VII disparate treatment

case—whether the defendant intentionally discriminated against the plaintiff." (internal quotation and citation omitted)).

[20] *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977); *Mandell v. County of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003); *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 95 (2d Cir. 1999).

employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. County of Rockland*, - - - F.3d - - -, Docket No. 09-0759-cv, 2010 WL 2541179, at *5 (2d Cir. June 25, 2010) (quoting *Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir. 2000)). "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical. In other words, the comparator must be similarly situated to the plaintiff in all material respects." *Id*. (internal quotations and citations omitted).

For several reasons, plaintiff did not make that showing at trial. First, plaintiff's conduct violated STS policy and some of the conduct Carla Chica engaged in did not. Second, even if certain conduct of Chica, Flores, and other drivers did violate STS policy, there was no credible evidence that STS was aware of this. Third, plaintiff has not shown that Chica, Flores, or any female driver had a similar long history of disciplinary problems like plaintiff's but was allowed to remain on the job.

1. Conduct That Violates Company Policy vs. Conduct That Does Not

First, with respect to Chica picking up her child at home and driving him to school in her school bus, as discussed in the Findings of Fact, this did not violate STS's rules. As also discussed above, plaintiff's drop-off of Cassandra Hopkins and Melissa Ridge, however, did violate the rules. Clearly, an employee who violates a company policy is not similarly situated to an employee who does not violate the policy. *See Santiago v. Gen. Dynamics Elec. Boat Div.*, Civil Action No. 3:04-CV-2062 (JCH), 2006 WL 3231413, at *6 (D. Conn. Nov. 7, 2006) (finding plaintiff not similarly situated to comparator employee who engaged in similar conduct because, when comparator employee engaged in conduct, company policy permitted conduct but when plaintiff engaged in conduct, company policy prohibited conduct); *see also Padilla v. Harris*, 285 F. Supp. 2d 263, 270 (D. Conn. 2003) (finding comparator employee not similarly situated to plaintiff where plaintiff produced no evidence that comparator employee had violated company rule that plaintiff violated).

Accordingly, plaintiff and Chica are not similarly situated simply because Chica used her bus to drive her son to school. Chica's conduct did not violate STS policy, but plaintiff's did.

2. STS's Awareness of Conduct

Second, even assuming Flores, Chica, or other female drivers made unauthorized pickups and drop-offs or brought their children into the bus yard, plaintiff has failed to produce credible evidence that STS knew about this. An employee who allegedly engaged in misconduct comparable to the plaintiff's is not similarly situated to the plaintiff when the employer is unaware of what the comparator employee supposedly did. *See Elam v. Regions Fin. Corp.*, 601 F.3d 873, 881 (8th Cir. 2010) (affirming district court's grant of summary judgment to defendant where, *inter alia*, "[plaintiff] did not present any evidence that . . . supervisors were aware of the alleged misconduct of [co-workers.]"); *Wallace v. Methodist Hosp.*, 271 F.3d 212, 221 (5th Cir. 2001) (affirming judgment as a matter of law for defendants in gender discrimination case and explaining that co-workers were not similarly situated to

11

plaintiff because, *inter alia*, "no one in a supervisory capacity was aware of the" co-workers' alleged misconduct); *Brasic v. Heinemann's Inc.*, 121 F.3d 281, 286 (7th Cir. 1997) (affirming summary judgment for defendant in Title VII sex discrimination case where there was no evidence "that management personnel responsible for enforcing the rules were aware of the incidents" involving supposedly similarly situated employees); *accord Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 n.5 (11th Cir. 2003); *Kipp v. Mo. Highway & Trans. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002).

Here, there is no credible evidence that STS knew about (1) alleged unauthorized drop-offs by the after-school activities bus, or (2) Chica and/or Flores bringing their children into the bus yard, even assuming *arguendo* that this in fact occurred, or (3) Chica's use of her bus to pickup her child at home. Regarding (2), as discussed in the Findings of Fact, during the morning hours, Tully and Alarcon focused on work inside the trailer and were not actively observing the six-acre bus yard. Thus, the Court credits their testimony that they never saw Chica or Flores bring their children into the yard. Moreover, plaintiff has produced no evidence that any other STS supervisory employee observed Chica or Flores bring their children into the yard. In sum, even assuming female STS employees violated the rules regarding pickups and drop-offs, STS was not aware of these violations.[21]

### 3. Plaintiff's Disciplinary Record

---

[21] Similarly, although plaintiff asserts that female drivers violated STS policy by picking up "walkers"—students who lived too close to school to take the bus (Tr. 21:12-22:5)—there is no credible evidence that STS was aware of this.

Finally, plaintiff has not shown that Flores, Chica, or, for that matter, any female driver had the extensive disciplinary record that he did. It is well settled that employees are not similarly situated if they have materially different disciplinary records. *See, e.g.*, *Saenger v. Montefiore Med. Ctr.*, - - - F. Supp. 2d - - -, No. 07-CV-488 (KMK), 2010 WL 1529400, at *15 (S.D.N.Y. Mar. 31, 2010) ("[The comparator employee] was also materially different from Plaintiff because she did not have an extensive disciplinary history, and had not been repeatedly warned that additional misconduct could result in termination."); *McKinney v. Bennett*, No. 06 Civ. 13486 (SCR) (MDF), 2009 WL 2981922, at *7 (S.D.N.Y. Sept. 16, 2009) (finding plaintiff not similarly situated to comparator employees because, *inter alia*, he "has not shown these people to have a comparable disciplinary history to his own or to have any disciplinary history at all . . . ."); *Babcock v. N.Y. State Office of Mental Health*, No. 04 Civ. 2261(PGG), 2009 WL 1598796, at *12 (S.D.N.Y. June 8, 2009) (finding plaintiff, who had received a "counseling memo" two years before employer made relevant employment decision, was not similarly situated to co-worker who had received a counseling memo eleven years before and maintained an "unblemished" performance record since then); *Guerrero v. Conn. Dep't of Children & Families*, 315 F. Supp. 2d 202, 210 (D. Conn. 2004) ("Under this standard, [plaintiff] is not similarly situated to the comparator. Put simply, the comparator did not have the history of past disciplinary problems that [plaintiff] had.")

Here, as explained above, plaintiff had an extensive disciplinary history, including

multiple "final" warnings, multiple accidents, and two transfers from one school district to another. Although plaintiff argues that he accrued much of his disciplinary record in the mid- to late 1990s—years before the 2006 incident—the Court rejects this argument. Even if the Court only examined plaintiff's disciplinary record from his last several years at STS, plaintiff's record still shows repeated instances of dangerous and inappropriate conduct, complaints from parents and school personnel, and multiple "final warnings."[22] By any measure, plaintiff had an extensive disciplinary record. Moreover, plaintiff acknowledged that he had been specifically warned about making unauthorized drop-offs and pickups. (Tr. 156:3-157:2.) Thus, even if female employees made unauthorized drop-offs or pickups, there is no evidence that any such female employee had a disciplinary record comparable to plaintiff's but was allowed to remain on the job. Indeed, there is evidence STS fired female employees who engaged in conduct that plaintiff was not fired for. Specifically, female employees were fired for, *inter alia*, "not adhering to our rules and regs,"[23] and being involved in an accident.[24] Plaintiff's Summary of Problems reflects that he was involved in multiple accidents and repeatedly violated STS rules but, unlike these female employees, was not fired.

To sum up, plaintiff attempted to show intentional discrimination by demonstrating that female employees also made unauthorized drop-offs and pickups but were not disciplined by STS. However, in order for the Court to infer gender discrimination, plaintiff must show that these female employees were similarly situated. Plaintiff has not done this. Indeed, the female employees were not similarly situated because they either (1) engaged in conduct that was actually permitted by STS; (2) engaged in conduct that, even if prohibited, was unknown to STS; or (3) did not have the extensive disciplinary record that plaintiff did.[25] As such, plaintiff has not shown by a

---

[22] To the extent plaintiff relies on his "Ten Years of Outstanding Service" certificate (Pl.'s Ex. 2) as evidence of his good history of performance, the Court rejects that contention. The Court, as the trier of fact, finds credible DiDomenico's testimony that every employee received that award on their 10th anniversary of employment regardless of performance (despite the reference on the certificate to "outstanding service") (Tr. 362:10-363:24) and finds that this certificate has no probative value regarding plaintiff's actual performance. Instead, the Court finds plaintiff's extensive disciplinary record makes clear that there were numerous performance problems over the years.

[23] (Def.'s Ex. U.)

[24] (Def.'s Ex. Y-1.)

[25] Defendant also argues that the plaintiff's claim should fail because it is undisputed that DiDomenico both hired and fired the plaintiff and because DiDomenico, a male, is also in the protected class. Under the so-called "same actor inference," "when the person who made the decision to fire was the same person who made the decision to hire, it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire." *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997). The inference grows stronger when, as here, the decisionmaker is also a member of the protected class. *Earvin v. City Univ. of N.Y.*, No. 03 CV 9521 (BSJ) (DCF), 2008 WL 5740359, at *6 (S.D.N.Y. Jan. 17, 2008) ("[T]he decisionmakers' status as protected class members enhances the inference that there was no discriminatory motive."); *Connell v. Consol. Edison Co. of N.Y.*, 109 F. Supp. 2d 202, 210

13

preponderance of the evidence that STS discriminated against him on the basis of gender. In short, having carefully analyzed the evidence at trial, the Court finds that plaintiff was not fired because of his gender; rather, the Court finds that plaintiff was fired because of a long history of disciplinary problems that culminated in the March 2006 incident. Even though plaintiff disagrees with that decision, the Court finds that there was nothing discriminatory about it.

## V. CONCLUSION

Plaintiff has not shown by a preponderance of the evidence that STS discriminated on the basis of gender when it terminated him. Thus, the Court finds in favor of defendant on plaintiff's claim. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated:    July 15, 2010
          Central Islip, New York

* * *

Plaintiff is represented by Glenn Suarez, 50 Elm Street, Huntington, New York, 11743. Defendant is represented by Paul Dashefsky, 317 Middle Country Road, Smithtown, New York, 11787.

---

(S.D.N.Y. 2000). The inference grows weaker, however, with the passage of time between the hiring and firing. *See, e.g.*, *Carlton v. Mystic Transp.*, 202 F.3d 129, 138 (2d Cir. 2000) (finding seven years between plaintiff's hiring and firing "significantly weaken[ed]" the inference). The inference was originally developed in age-discrimination cases, and the Second Circuit has not expressly decided whether it should be applied in the Title VII context. *See Feingold v. N.Y.*, 366 F.3d 138, 155 & n.15 (2d Cir. 2004) (declining to "pass judgment on the extent to which this inference is either required or appropriate outside the Age Discrimination in Employment Act (ADEA) context in which it generally is applied" but applying inference to a Title VII claim *arguendo*). Nonetheless, district courts in this circuit have applied the inference to Title VII claims, including gender discrimination. *See, e.g.*, *Woodward v. Monticello Cent. Sch. Dist.*, No. 06-Civ-13361 (KMK), 2008 WL 5062125, at *14 (S.D.N.Y. Dec. 1, 2008) (race discrimination case); *Zuffante v. Elderplan Inc.*, No. 02 Civ. 3250 WHP, 2004 WL 744858, at *6-7 (S.D.N.Y. Mar. 31, 2004) (gender discrimination case). The Court agrees with these district court decisions and finds no basis to restrict the same-actor inference to age-discrimination claims. Thus, despite the fact that twelve years passed between plaintiff's hiring and firing, the fact that DiDomenico both hired and fired plaintiff and is also in the protected class makes it at least somewhat more "difficult to impute . . . invidious motivation" to STS, although it is in no way dispositive of plaintiff's claim. *Cf. Grady*, 130 F.3d at 560. In any event, even in the complete absence of the same-actor inference, plaintiff's claim fails for all of the reasons discussed *surpa*.